Lawrence C. Ecoff, Esq. (SBN 143814)
**ECOFF CAMPAIN & TILLES, LLP**
A Limited Liability Partnership
280 South Beverly Drive, Suite 504
Beverly Hills, California 90212
Telephone:  (310) 887-1850
Facsimile:   (310) 887-1855
E-mail: ecoff@ecofflaw.com

Robert S. Altagen, Esq. (SBN 5644)
LAW OFFICES OF ROBERT S. ALTAGEN
1111 Corporate Center Dr., Suite 201
Monterey Park, California 91754
Telephone: (323) 268-9588
Facsimile: (323) 268-8742
E-mail: rsaink@earthlink.net

Attorneys for Plaintiff
EFT HOLDINGS, INC.,
A Nevada Corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EFTHOLDINGS, INC., f/k/a EFT BIOTECH HOLDINGS, INC., a Nevada corporation, <br><br> Plaintiff, <br><br> v. <br><br> CTX VIRTUAL TECHNOLOGIES, INC., a Delaware corporation; BUCKMAN, BUCKMAN & REID, INC., a Delaware corporation; CLIFF RHEE, an individual; PETER LAU, an individual, <br><br> Defendants. | Case No.: cv 15-1597-GW (CWx) <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> 1.  BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING <br><br> 2.  BREACH OF FIDUCIARY DUTY <br><br> 3.  FRAUD – MISREPRESENTATION <br><br> 4.  FRAUD – CONCEALMENT <br><br> **[DEMAND FOR JURY TRIAL]** |

Plaintiff, EFT HOLDINGS, INC., a Nevada corporation, alleges and avers as follows:

### PARTIES

1. Plaintiff, EFT HOLDINGS, INC., (hereinafter referred to as "EFT" or "Plaintiff"), is a publicly traded company formerly known as EFT BIOTECH HOLDINGS, INC., and is, and at

1

**SECOND AMENDED COMPLAINT**

all times relevant herein was, a corporation formed and existing under the laws of the state of Nevada, but doing business in the State of California at 17800 Castleton Ave., Suite 300, City of Industry, County of Los Angeles, State of California.

2. Plaintiff is informed and believes, and based thereon alleges, that Defendant CTX VIRTUAL TECHNOLOGIES, INC. (hereinafter referred to as "CTX") is, and at all times relevant herein was, an entity formed and existing under the laws of the state of Delaware, but doing business in the State of California, and with its headquarters at 2385 NW Executive Center Drive, Boca Raton, Florida 33431, and in Ontario, Canada at 2425 Matheson Blvd. East, Mississauga, Ontario, Canada.

3. Plaintiff is informed and believes, and based thereon alleges, that Defendant BUCKMAN, BUCKMAN & REID, INC. (hereinafter referred to as "BB&R") is, and at all relevant times hereto was, a New Jersey corporation with its principal place of business at 174 Patterson Ave., Shrewbury, New Jersey 07702. BB&R is a broker/dealer registered with the Securities and Exchange Commission and with FINRA.

4. Plaintiff is informed and believes, and based thereon alleges, that PETER LAU (hereinafter referred to as "LAU") is, and at all relevant times hereto was, an indirect principal of BB&R, and a member of the Board of Directors of CTX. Plaintiff is further informed and believes, and based thereon alleges, that LAU resides at 315 W. 36th Street, Apartment 17B, New York, NY 10018, and is a resident and domicile of New York City, New York.

5. Plaintiff is informed and believes, and based thereon alleges, that CLIFF RHEE (hereinafter referred to as "RHEE") is, and at all relevant times hereto was, a principal shareholder and officer of CTX, and a member of the Board of Directors of CTX. Plaintiff is further informed and believes, and based thereon alleges, that RHEE resides in Ontario, Toronto, in the province of Canada, and is a resident and domicile of Ontario, Toronto. Plaintiff is also informed and believes, and based thereon alleges, that RHEE conducts business in Boca Raton, Florida at CTX. CTX, BB&R, LAU and RHEE are collectively referred to at times as "Defendants."

6. Each of the Defendants is, and at all relevant times herein mentioned was, an agent, employee, joint-venturer, co-venturer, shareholder, director, officer, co-conspirator, and/or partner of each of the other Defendants, and in doing the things herein described was acting

within the scope of its authority as agent, employee, joint-venturer, co-venturer, co-conspirator, shareholder, officer, director and/or partner.

7. Plaintiff is informed and believes, and on that basis alleges, that each of the named Defendants participated in, and is in some manner responsible for, the acts described in this Complaint and the damage resulting therefrom. Plaintiff is further informed and believes, and on that basis alleges, that each of the named Defendants has acted in concert and participation with each other, or with the consent and ratification of the other, concerning each of the claims in this Complaint.

## JURISDICTION AND VENUE

8. Jurisdiction is vested in this Court pursuant to 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of this State and citizens or subjects of a foreign state.

9. Venue is proper in the Central District of California pursuant to 28 U.S.C. 1391, because a substantial part of the events or omission giving rise to the claim occurred within the Central District of California. EFT has its principal place of business in California. BB&R maintains its principal place of business in the State of New Jersey, but engaged in continuous and systematic business in California and is believed to be registered and licensed with California as an active brokerage firm. CTX maintains its principal place of business in the State of Florida, but engaged in continuance and systematic business in California. RHEE and LAU further are engaged in business in the County of Los Angeles, State of California.

## COMMON ALLEGATIONS

*The Investment Opportunity*

10. EFT operates a multi-level distribution system which promotes and sells its products. EFT also invests its funds through various forms and transactions.

11. In or about January 2007, EFT utilized the services of BB&R as its Placement Agent to represent EFT in raising substantial funds for EFT in connection with its own confidential private placement offering. BB&R was the broker/dealer which prepared the offering memorandum for EFT, and was instrumental in its financing efforts. Through such

relationship, EFT developed a strong working relationship with BB&R, and placed its trust and confidence in BB&R. EFT believed that BB&R would, then and always, act in EFT's best interest.

12. BB&R is a financial consulting firm and placement agent. BB&R was approached by CTX in or around April 2010 for the purpose of obtaining BB&R's assistance in raising $5 million in financing by way of a "private placement." CTX was looking for a $5 million cash infusion. In connection with its duties and responsibilities as placement agent for CTX, BB&R performed certain due diligence with respect to CTX, which was completed in early June 2010. Such due diligence was performed by, among others, LAU.

13. On or about June 8, 2010, EFT's Jack Qin and George Curry met at BB&R in New York. BB&R introduced EFT to several potential investment opportunities, one of which was an investment with CTX. EFT was looking for an interest producing asset which would generate cash flow, and not an investment in acquiring stock of a separate company.

14. In communicating such investment offering to EFT, BB&R's LAU prepared and delivered to EFT a company overview, Private Placement Memorandum and related offering documents for such an investment with CTX, which were reviewed and approved by RHEE, CTX's officer, director and principal shareholder. Specifically, EFT was presented with a written "Company Overview" which represented that:

    (a) CTX manufactures and sells mobile communication and electronic devices and provides technology consulting services. It designs and manufactures cellular telephones, and markets its own proprietary stand-alone virtual keyboards;

    (b) Beijing Capitel placed a $45 million order for 200,000 Smartphones incorporating the Smartphone Virtual Keyboard;

    (c) Utilizing its proprietary technology, CTX was in the process of developing new product lines; and

    (d) 90% of the proceeds from the financing ($4,313,000) would be used for completion of the manufacturing prototype of the virtual keyboard embedded smart phone, which monies would be allocated over a six month period.

15. CTX, through BB&R, also delivered an investment offering circular, which provided as follows:

    (a) CTX was looking to secure financing of $5,000,000;

    (b) The proceeds of the financing were to be used for:

        i. Development of a module prototype for SMART Virtual Keyboard;

        ii. Printed circuit board development;

        iii. Software and hardware development; and

        iv. Patent IP protection and working capital.

16. CTX represented that it held certain patent and trade secret rights relating to various aspects of its technologies, **which were of material importance** to the company and its future prospects. CTX further represented that it intended on becoming a reporting company under the Securities and Exchange Act of 1934, through the filing of the requisite documents with the Securities and Exchange Commission.

17. CTX also provided a Confidential Term Sheet, which stated that "a major electronics manufacturer/distributor has committed for $60 million in product purchases (or 2 million product units) over 3 years for evoMouse and other products."

18. EFT was preliminarily interested in exploring the opportunity with CTX after its discussion with BB&R in New York. In connection with EFT's own due diligence, on June 30, 2010, BB&R provided EFT with access to its virtual document room ("V-room"), which contained all of the uploaded documents from BB&R relating to CTX. Specifically, the V-Room contained the general and financial information of CTX, including a PowerPoint presentation about CTX, cash flow projections, proforma income statement, Confidential Term Sheet, Company overview, private placement memorandum, and an investment summary.

19. Then, on July 16, 2010, EFT's management was informed, based upon representations by BB&R's LAU and CTX's RHEE, that:

    (a) CTX had signed two agreements that would greatly enhance CTX's profits over the next two years, the first with Beijing Capitel Yongyang Technology

   Co., Ltd., ... (whereby CTX was expected to net $45 million in sales from 2010-2012), and the second with Lenovo Computers ...(whereby CTX was expected to net $65 million in sales from 2010-2012);

 (b) CTX was expected to sign a deal with Hyundai Automotive Group ...worth $135 million in future sales;

 (c) CTX's projected net income for 2010 would be $3.3 million and for 2011 would be $5.3 million; and

 (d) CTX's annual revenue was $37 million, even notwithstanding the above referenced deals with Beijing Capitel, Lenovo and Hyundai.

20. Based upon the various representations made by CTX and BB&R, both orally by their principals, and in writing, on or about July 23, 2010, EFT decided to enter into the lending opportunity with CTX and wired $5 million to an escrow account to fund the investment, which was released to CTX on July 26, 2010.

21. The transaction was structured as a Note Purchase Agreement, with 8% Convertible Note, sometimes referred to as a convertible debenture. Pursuant to the Note Purchase Agreement ("NPA"):

 (a) Upon conversion of the Note by either EFT or CTX, EFT was entitled to designate one director for the board of directors; and

 (b) If CTX did not list its current stock for trading on any of the American Stock Exchange, OTC Bulletin Board or NASDAQ by February 28, 2011, CTX would incur a penalty whereby the number of shares of common stock included in each Unit delivered to EFT would equal 125% of the shares included as part of each Unit.

22. The 8% Convertible Note permitted CTX the ability to convert the entire principal amount then outstanding under the Note into Conversion Units, or stock in CTX, at any time after January 26, 2011.

23. EFT received notice from CTX on March 9, 2011, that CTX was exercising its option under the NPA to convert the note to equity in the form of common stock, whereby after

such conversion EFT became one of the largest shareholders of CTX.

24. To date, over three years after EFT transferred its funds to CTX, CTX is still not traded on the American Stock Exchange, OTC Bulletin Board or NASDAQ. The shares of stock owned by EFT are not freely traded on the open public market. Moreover, CTX has had several additional rounds of financing which have substantially diluted EFT's shareholder interest in CTX.

**Discovery of the Fraud**

25. Beginning on or about August 18, 2014, EFT discovered, for the first time, that the representations made in the CTX Private Placement Memorandum and offering documents were untrue. Such discovery came in accordance with other litigation involving the CTX financing transaction.

26. RHEE and LAU, principals of both CTX and BB&R, respectively, were deposed in a related lawsuit, *EFT Holdings, Inc. v. George Curry, U.S.D.C. Case No. 2:14-cv-02667-GW-CW*. LAU owns an indirect ownership interest in BB&R, through his company Greenstone, and is the Managing Director, Investment Banking, Financial Services for BB&R. LAU is also a member of the Board of Directors of CTX. RHEE is an officer, director and principal substantial shareholder of CTX.

27. LAU was introduced to CTX in April 2010, when CTX was looking for private placement financing. After his introduction to CTX, LAU began performing due diligence with respect to CTX in order to prepare a private placement memorandum to submit to potential third party investors, including EFT. BB&R was responsible for preparing the Private Placement Memorandum, as well as its related documents. LAU was the point person for the transaction at BB&R, and the person who initially reviewed the materials and decided to take on CTX as a client.

28. LAU spent very little time performing his due diligence and drafting the private placement memorandum. What ordinarily takes 120 days to complete, LAU completed both the due diligence and private placement memorandum in 60 days. He, personally, prepared the private placement memorandum, which was also reviewed and approved "100%" by RHEE and

**SECOND AMENDED COMPLAINT**

CTX. Defendants knew that investors, like EFT, were relying on the content of the private placement memorandum in deciding whether or not to participate as an investor.

29. In the course of his due diligence of CTX, and prior to the preparation of the private placement memorandum, LAU was informed that:

(a) CTX did not own any factories in China, but instead leased its factory. CTX had only an option to purchase the factory. The monies raised from EFT, and others, pursuant to the 2010 private placement, was intended to be used to purchase a factory in China, rather than the use of proceeds outlined in the private placement memoranda and offering materials;

(b) CTX did not have any agreements with LG or Hyundai. CTX had non-binding letters of intent. In fact, the contract with Hyundai was not even finalized until 2013, three years later;

(c) With respect to the Beijing Capitel contract, no monies had been received by CTX, and no monies were anticipated until 2015, even though the private placement memorandum represented that the monies were expected to net in 2010-2012;

(d) CTX did not own Celluon, or even a majority interest in Celluon. Celluon was owned substantially by RHEE. The funds from EFT were utilized to purchase RHEE's interest in Celluon, along with the factory in China;

(e) Although CTX represented that "a major electronics manufacturer/distributor has committed for $60 million in product purchases (or 2 million product units) over 3 years for evoMouse and other products" only some parts were sold and the sales in 2010 alone were insignificant;

(f) The primary patent rights upon which RHEE was the inventor was not filed until the latter part of 2012; and

(g) the financial statements that were included in the V-room were not audited and basically were internally generated by CTX.

30. Despite being aware of the foregoing information as reflected in paragraph 30, the

private placement memoranda and offering documents contained contrary representations and information, clearly in an attempt to attract and lure potential investors.

31. In addition, CTX touted its ownership of Celluon as an important part of CTX in the offering documents. CTX represented that through its majority-controlled subsidiary, Celluon, Inc., CTX markets and sells is proprietary stand-alone virtual keyboard for computers, develops new and innovative mobile communication and electronic devises, and provides technology consulting services. Yet, shortly after receiving EFT's funds, CTX sold Celluon and its factory. RHEE believed that the Celluon technology *was antiquated*, and sold it to a company, which is now CTX's *largest competitor*.

32. In fact, and contrary to the depiction of CTX in the offering documents, in 2010, and based upon his review of CTX, LAU consider the company to be a "gamble." The success of the company was based upon whether the virtual keyboard technology breaks through the market. RHEE, the CEO of CTX, had a vision. RHEE spent five years developing the technology, and ran out of money, and therefore went to BB&R for additional funding. LAU believed that *if* CTX's concept was developed and successful, the company would succeed. He "bet on RHEE" in deciding to assist with the private equity financing raise. The offering documents, however, portray a much different picture.

33. Although the Private Placement Memorandum portrayed a company with strong financials, significant multi-million dollar contracts in place, and the ownership of valuable patents and intellectual property rights, the truth, as revealed in the depositions of RHEE and LAU, was that Defendants were raising monies based upon false representations.

34. EFT has repeatedly requested information as to the use of the funds received from CTX's private offering. No such information has been forthcoming. EFT has also made inquiries as to the status of the SEC filings for CTX to be traded on the open public market. CTX has repeatedly represented, time and again, that it would be completed in a matter of months.

35. As of June 2014, CTX still had not completed its filing of an S-1 in order to obtain registration on the stock exchange. More than four years after its private placement raise,

9
**SECOND AMENDED COMPLAINT**

CTX still had not secured all of the necessary audited financial statements, and habitually failed to get its reporting completed on time.

## FIRST CLAIM FOR RELIEF

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (As Against CTX and RHEE)

36. Plaintiff hereby incorporates, by this reference, each and every allegation set forth in paragraphs 1 through 35, inclusive, as if set forth in full.

37. There is implied in every agreement, including the Note Purchase Agreement and Convertible Note, a covenant that the Defendants would act in good faith and deal fairly with Plaintiff, and that they would do nothing to interfere with Plaintiff's right to receive the benefits of the Note Purchase Agreement and Convertible Note.

38. Plaintiff is informed and believes, and on that basis alleges, that the Note Purchase Agreement and Convertible Note contained an implied covenant of good faith and fair dealing that CTX was secure the necessary filings sufficient for the CTX stock to be openly traded on the stock market, including that owned by EFT. Such agreements required the Defendants to act in good faith and to engage in fair dealing with the Plaintiff, to deal with it fairly and honestly, and to do nothing to impair, interfere with, hinder or potentially injure its rights.

39. Plaintiff is informed and believes, and on that basis alleges, that Defendant CTX breached the covenant of good faith and fair dealing by, including, but not limited to: (a) failing to obtain all of the necessary audited financial statements in a reasonable period of time; (b) failing to retain the services of competent professionals to prepare the SEC filings for CTX to secure the right to have its stock traded openly on the stock exchange; (c) failing to act competently and diligently in securing and processing the necessary documents and submissions to the SEC so that CTX's stock would be freely traded on the stock exchange.

40. Plaintiff performed all acts, duties and responsibilities required of it to be performed under the Note Purchase Agreement and Convertible Note, except those which were prevented or excused by the Defendant's bad faith conduct.

41. As a direct and proximate cause of the Defendant's breach of the covenant of

good faith and fair dealing, Plaintiff has been damaged in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

## SECOND CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

### (As Against BB&R and LAU)

42. Plaintiff hereby incorporates, by this reference, each and every allegation set forth in paragraphs 1 through 41, inclusive, as if set forth in full.

43. Beginning in or about 2006, EFT engaged in discussions with BB&R for BB&R to assist EFT in raising monies for its business and operations pursuant to a sale of common stock and warrants in accordance with a Confidential Private Offering Memorandum. BB&R was intended to act, and did act, and operate as a placement agent for EFT, to act as its exclusive placement agent in connection with the issuance and sale of units by EFT. In fact, BB&R was the broker/dealer which prepared the offering memorandum for EFT, and was instrumental in its financing efforts.

44. Through such relationship, EFT developed a strong working relationship with BB&R, and placed its trust and confidence in BB&R. EFT believed that BB&R would, then and always, act in EFT's best interest.

45. Following the discussions between EFT, BB&R and Lau, EFT and BB&R entered into a formal written agreement, captioned Placement Agent Agreement, dated January 3, 2007. The Placement Agent Agreement provided for the terms and provisions for the agreement between EFT and BB&R for BB&R to assist with the monetary raise pursuant to an offering memorandum and subscription agreement.

46. Following execution of the Placement Agent Agreement, BB&R assisted EFT in its monetary raised, in which in excess of $50 million dollars was raised in connection with the sale of common stock and warrants in EFT. However, after execution and the money raise, BB&R and Lau continued to offer financial advice and assistance to EFT.

47. From at least 2008 through July 2010, BB&R and Lau provided, on a non-exclusive basis, financial and business advisory services to EFT. Through those years, BB&R

and Lau would communicate and discuss with EFT, and its officers, principals, and employees, financial advice, business advisory services, and financial services as it relates to EFT. Such communications would include telephonic consulting, as well as in person meeting.

48. In or about April 2010, BB&R was approached by CTX for the purpose of obtaining BB&R's assistance in raising $5 million in financing by way of a "private placement." CTX was looking for a $5 million cash infusion. In connection with its duties and responsibilities as placement agent for CTX, BB&R performed certain due diligence with respect to CTX, which was completed in early June 2010. Such due diligence was performed by, among others, LAU.

49. At the same time that BB&R was acting as placement agent for CTX, and also providing business and advisory services for EFT, BB&R introduced the investment offering of CTX to EFT. EFT believed, based upon its relationship with BB&R for years, and the financial advisory and business services provided, that BB&R would be truthful, honest, and act with loyal and care in disclosing information to EFT, or representing information and investment opportunities to EFT.

50. At all times mentioned, Defendants BB&R and LAU, upon whose trust and confidence EFT placed as its representatives and former Placement Agent, owed Plaintiff a duty of good faith and fair dealing, and in connection therewith owed Plaintiff a duty of loyalty and fairness as fiduciaries. EFT relief upon BB&R, and always believed that BB&R was acting for and in the best interest of EFT, and was acting in a fiduciary capacity.

51. In or about June 2010, and continuing through July 2010, and based upon the relationship between BB&R and EFT, BB&R owed EFT a duty to disclose all material information and facts relating to the potential investment by EFT with CTX. BB&R, along with LAU, performed due diligence with respect to CTX, prepared the offering documents, and prepared and provided to EFT the private placement memorandum, Confidential Term Sheet and Company Overview. BB&R and LAU were aware of the false statements and inaccuracies contained in the offering documents, but failed to disclose them.

52. Defendants BB&R and LAU, therefore, breached their fiduciary duty of good

1  faith, care, and loyalty owed to EFT by: (a) preparing false and inaccurate offering documents
2  for CTX, and representing them to be accurate, including the Company Overview, Confidential
3  Term Sheet and private placement memorandum; and (b) failing to disclose the false, inaccurate
4  and misleading information in the Company Overview, Confidential Term Sheet and private
5  placement memorandum.

6　　　　53.　As a direct and proximate result of the aforesaid breach of fiduciary duty by
7  Defendants, and each of them, Plaintiff has been damaged in excess of two million five hundred
8  thousand dollars ($2,500,000), but according to proof at trial.

## THIRD CLAIM FOR RELIEF

## FRAUD - MISREPRESENTATION

(As Against All Defendants)

13　　　　54.　Plaintiff hereby incorporates, by this reference, each and every allegation set forth
14  in paragraphs 1 through 46, inclusive, as if set forth in full.

15　　　　55.　Beginning in or about June 2010, Defendants, collectively, prepared certain
16  offering documents intended to present to investors to secure private financing for CTX. The
17  documents included, among else, a Company Overview, Confidential Term Sheet, and private
18  placement memoranda (collectively the "Offering Documents"). Additional documents were
19  prepared, and uploaded into a V-room for potential investors, like EFT, to review in consideration
20  as to whether to enter into an investment opportunity with CTX.

21　　　　56.　The Offering Documents were prepared by LAU and BB&R, for and on behalf of
22  CTX, and reviewed, approved and authorized by RHEE and CTX.

23　　　　57.　Beginning in or about June 2010, and continuing through July 2010, BB&R and
24  CTX provided the Offering Documents to EFT for EFT to review. BB&R and CTX represented
25  that the information contained within the Offering Documents, which was prepared by LAU and
26  reviewed, approved and authorized by RHEE, was truthful and accurate.

27　　　　58.　The Offering Documents prepared by Defendants represented that:
28　　　　　　　(a)　Beijing Capitel placed a $45 million order for 200,000

---
13

**SECOND AMENDED COMPLAINT**

                Smartphones incorporating the Smartphone Virtual Keyboard;

(b)    90% of the proceeds from the financing ($4,313,000) would be used for completion of the manufacturing prototype of the virtual keyboard embedded smart phone, which monies would be allocated over a six month period;

(c)    CTX held certain patent and trade secret rights relating to various aspects of its technologies, **which were of material importance** to the company and its future prospects;

(d)    CTX intended on becoming a reporting company under the Securities and Exchange Act of 1934, through the filing of the requisite documents with the Securities and Exchange Commission;

(e)    "a major electronics manufacturer/distributor has committed for $60 million in product purchases (or 2 million product units) over 3 years for evoMouse and other products;

59.    Then, on July 16, 2010, EFT's management was verbally informed, based upon verbal representations by BB&R's LAU and CTX's RHEE, that:

(a)    CTX had signed two agreements that would greatly enhance CTX's profits over the next two years, the first with Beijing Capitel Yongyang Technology Co., Ltd., ... (whereby CTX was expected to net $45 million in sales from 2010-2012), and the second with Lenovo Computers ...(whereby CTX was expected to net $65 million in sales from 2010-2012);

(b)    CTX was expected to sign a deal with Hyundai Automotive Group ...worth $135 million in future sales;

(c)    CTX's projected net income for 2010 would be $3.3 million and for 2011 would be $5.3 million; and

(d)    CTX's annual revenue was $37 million, even notwithstanding the

**SECOND AMENDED COMPLAINT**

above referenced deals with Beijing Capitel, Lenovo and Hyundai.

60. EFT, in providing funds for the financing of CTX, relied upon such representations as truthful and accurate. In so doing, EFT's reliance was reasonable and justifiable under the circumstances. CTX was represented by a believed reputable broker/dealer, BB&R, who was instrumental in raising funds for EFT. EFT had placed its trust and confidence in BB&R, and therefore had no reason to believe that the representations as made, and as set forth above, were false or inaccurate. Had EFT known, or otherwise been informed, that the representations made orally and in the Offering Documents were false or untrue, EFT would have never provided the funds in connection with CTX's private placement financing.

61. The representations by CTX and BB&R, however, as set forth in paragraphs 51 and 52 above, were materially false and misleading. In truth,

    (a) CTX did not own any factories in China, but instead leased its factory. CTX had only an option to purchase the factory. The monies raised from EFT, and others, pursuant to the 2010 private placement, was intended to be used to purchase a factory in China, rather than the use of proceeds outlined in the private placement memoranda and Offering Documents;

    (b) CTX did not have any agreements with LG or Hyundai. CTX had non-binding letters of intent. In fact, the contract with Hyundai was not even finalized until 2013, three years later;

    (c) With respect to the Beijing Capitel contract, no monies had been received by CTX, and no monies were anticipated until 2015, even though the private placement memorandum represented that the monies were expected to net in 2010-2012;

    (d) CTX did not own Celluon, or even a majority interest in Celluon. Celluon was owned substantially by RHEE. The funds from EFT were utilized to purchase RHEE's interest in Celluon, along with the factory in China;

(e) Although CTX represented that "a major electronics manufacturer/ distributor has committed for $60 million in product purchases (or 2 million product units) over 3 years for evoMouse and other products" only some parts were sold and the sales in 2010 alone were insignificant;

(f) The patents and technology that was touted as important in the Offering Documents was, in fact, considered antiquated and therefore sold to a competitor;

(g) The primary patent rights upon which RHEE was the inventor was not filed until the latter part of 2012;

(h) Although CTX projected a $3.3 million net income for 2010, CTX actually reflected a loss of almost $6.5 million, or more than a $10 million dollar swing; and

(i) Although CTX projected a $5.3 million net income for 2011, the financials for CTX were restated in 2013, which reflected a loss of $985,982.

62. As a direct and proximate result of Defendants' fraud and deceit, Plaintiff has been damaged in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

63. Defendants' conduct, as alleged herein, was intentional, malicious, oppressive, and despicable, thereby entitling Plaintiff to an award of punitive and exemplary damages, all according to proof at trial.

### FOURTH CLAIM FOR RELIEF

### FRAUD - CONCEALMENT

(As Against All Defendants)

64. Plaintiff hereby incorporates, by this reference, each and every allegation set forth in paragraphs 1 through 56, inclusive, as if set forth in full.

65. Plaintiff is informed and believes, and based upon such information and belief alleges, that Defendants are extremely knowledgeable and experienced in the preparation and importance of private placement memoranda and documents provided in connection with private financing.

66. Plaintiff further is informed and believes, and based upon such information and belief alleges that the Defendants knew, or should have known, that investors, like EFT, would rely upon the accuracy of private placement memorandum and offering documents in deciding whether or not invest or fund investments, and that all material information would be disclosed to potential investors.

67. Plaintiff is informed and believes, and based upon such information and belief alleges, that Defendants were aware of the following:

    (a) CTX did not own any factories in China, but instead leased its factory. CTX had only an option to purchase the factory;

    (b) The monies raised from EFT, and others, pursuant to the 2010 private placement, were intended to be used to purchase a factory in China, rather than the use of proceeds outlined in the private placement memoranda and Offering Documents;

    (c) CTX did not have any agreements with LG or Hyundai. CTX had non-binding letters of intent;

    (d) With respect to the Beijing Capitel contract, no monies had been received by CTX, and no monies were anticipated until 2015, even though the private placement memorandum represented that the monies were expected to net in 2010-2012;

    (e) CTX did not own Celluon, or even a majority interest in Celluon. Celluon was owned substantially by RHEE. The funds from EFT were intended to be utilized to purchase RHEE's interest in Celluon, along with the factory in China;

    (f) Although CTX represented that "a major electronics manufacturer/

17

**SECOND AMENDED COMPLAINT**

distributor has committed for $60 million in product purchases (or 2 million product units) over 3 years for evoMouse and other products" only some parts were sold and the sales in 2010 alone were expected to be insignificant;

(g) The patents and technology that was touted as important in the Offering Documents were, in fact, considered antiquated; and

(h) The primary patent rights upon which RHEE was the inventor were not filed.

68. Plaintiff is informed and believes, and based upon such information and belief alleges, that Defendants intended to conceal the true facts relating to CTX, and further knew that there was a strong likelihood that such deception would not be discovered by unsuspecting and unwitting investors.

69. Plaintiff is informed and believes, and based on such information and belief alleges, that Defendants owed a duty to EFT to disclose all material facts. Yet, the Defendants failed to make the disclosures as set forth in paragraph 60.

70. At all relevant times prior to transferring monies to CTX, EFT was unaware that of the facts set forth in paragraph 60.

71. Plaintiff is informed and believes, and based upon such information and belief alleges, that Defendants intentionally failed to disclose, concealed, and actively suppressed from EFT their knowledge about the facts set forth in paragraph 60.

72. Plaintiff is informed and believes, and based upon such information and belief alleges, that Defendants' failures to disclose and suppressions of information were made with the intent to induce EFT to act in the manner alleged, in reliance thereon, and to cause EFT to transfer monies and fund CTX's private financing.

73. At the time EFT tendered its monies to escrow on behalf of CTX, EFT was ignorant of the suppressed and non-disclosed facts, which were beyond EFT's knowledge.

74. Had EFT known the actual facts, EFT would not have entered into the transaction and Note Purchase Agreement.

**SECOND AMENDED COMPLAINT**

75. As a direct and proximate result of Defendants' fraud and deceit, and the alleged concealments and non-disclosures, Plaintiff has been damaged in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

76. Defendants' conduct, as alleged herein, was intentional, malicious, oppressive, willful, wanton and despicable, thereby entitling Plaintiff to an award of punitive and exemplary damages, all according to proof at trial.

**WHEREFORE**, Plaintiff EFT Holdings, Inc. prays for judgment against the Defendants, and each of them, as follows:

### ON THE FIRST CLAIM FOR RELIEF

1. For monetary damages in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

### ON THE SECOND CLAIM FOR RELIEF

2. For monetary damages in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

### ON THE THIRD CLAIM FOR RELIEF

3. For monetary damages in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

4. For punitive and exemplary damages according to proof at trial;

### ON THE FOURTH CLAIM FOR RELIEF

5. For monetary damages in excess of two million five hundred thousand dollars ($2,500,000), but according to proof at trial.

6. For punitive and exemplary damages according to proof at trial;

### AS TO ALL CAUSES OF ACTION

7. For costs of suit incurred herein;

8. For such other and further relief as the Court deems just, necessary and proper.

**SECOND AMENDED COMPLAINT**

Dated: December 28, 2015

Robert S. Altagen, Esq.
LAW OFFICES OF ROBERT S. ALTAGEN

ECOFF CAMPAIN & TILLES, LLP

_____
LAWRENCE C. ECOFF, ESQ.
ALBERTO J. CAMPAIN, ESQ.

Attorneys for Plaintiff
EFT HOLDINGS, INC.,
A Nevada Corporation

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Central District of California, Plaintiff hereby demands a trial by jury.

Dated: December 28, 2015

Robert S. Altagen, Esq.
LAW OFFICES OF ROBERT S. ALTAGEN

ECOFF CAMPAIN & TILLES, LLP

_____
LAWRENCE C. ECOFF, ESQ.
ALBERTO J. CAMPAIN, ESQ.

Attorneys for Plaintiff
EFT HOLDINGS, INC.,
A Nevada Corporation

SECOND AMENDED COMPLAINT